532 A.2d 406

COMMONWEALTH of Pennsylvania, Appellee,

v.

Charles N. LEE, Appellant.

Supreme Court of Pennsylvania.

Argued April 6, 1987.

Decided Oct. 15, 1987.

Michael J. McAllister, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Susan Willcox, Marion E. MacIntyre, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

This is a direct appeal as of right from the imposition of a judgment of sentence of death, 42 Pa.C.S. § 722(4), 9711(h).[1] Appellant was tried by a jury in August, 1979, in the Court of Common Pleas of Philadelphia County, Judge Edwin S. Malmed presiding. Appellant was convicted of first degree murder and robbery of the victim, Joyce Hunsicker, and

---

1. 42 Pa.C.S. § 722 provides, in relevant part, as follows:
   The Supreme Court shall have exclusive jurisdiction of appeals from final orders of the courts of common pleas in the following classes of cases: ...
   (4) Automatic review of sentences as provided by 42 Pa.C.S. § 9711(h) (relating to review of death sentence)....
   42 Pa.C.S. § 9711(h) provides:
   *(h) Review of death sentence.—*
   (1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.
   (2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.
   (3) The Supreme Court shall affirm the sentence of death unless it determines that:
   (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
   (ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or
   (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

was sentenced to death pursuant to the jury's determination.[2]

The record facts reveal that on Sunday, September 14, 1978, Joyce Hunsicker was found dead in her bed with a bullet lodged just below her left earlobe. Sometime during the late evening hours of September 12, or the early morning hours of September 13,[3] Hunsicker's killer was present in her bedroom, placed a pillow over her head, and shot her with a .38 caliber pearl-handled, semi-automatic pistol, killing her instantly. Missing from the decedent's left hand ring finger were two rings, a gold wedding band, and a matching diamond engagement ring.

2. A sentence of death for first degree murder may be imposed in Pennsylvania under procedures set forth at 42 Pa.C.S. § 9711, which provides:

*(a) Procedure in jury trials.—*

(1) After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

(2) In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

(3) After the presentation of evidence, the court shall permit counsel to present argument for or against the sentence of death. The court shall then instruct the jury in accordance with subsection (c).

(4) Failure of the jury to unanimously agree upon a sentence shall not impeach or in any way affect the guilty verdict previously recorded.

3. The written report of the Commonwealth's medical examiner, Dr. Catherman, who was called as a witness by the Commonwealth, put the time of decedent's injury and death "on or about 9/12/78, question mark as to specific time." (Quotation from N.T., p. 2.88). Dr. Catherman explicitly testified at trial that "death occurred at or about the period that I indicated, later on the 12th or early on the 13th." (Quotation from N.T., p. 2.89). Appellant's trial counsel attempted to create doubt as to Dr. Catherman's estimate of the time of death (see N.T., p. 2.90), but the evidence explicitly accepted by Judge Malmed was that death occurred late on September 12 or early in the morning of September 13. The homicide could not have occurred after noon

The Commonwealth's evidence implicating Appellant in the murder of Joyce Hunsicker and the robbery of her two rings was entirely circumstantial and consisted primarily of his incriminating admissions to two Commonwealth witnesses, Sandra Jenkins and Philip Fioravante.

Jenkins testified that she was socializing with the decedent, the Appellant, and other friends at her apartment on September 12, 1978. Early that evening, the decedent left the apartment but telephoned a half hour later to inquire whether Appellant would walk her home from a neighborhood restaurant. When advised of Hunsicker's request, Appellant left the apartment. Appellant, who was boarding in Jenkins' apartment at the time, telephoned a half hour later to say he wasn't returning that evening. Joyce Hunsicker was last heard from alive at 9:30 p.m. that night when she telephoned Jenkins that she had arrived home.

Jenkins further testified that around noon the next day, September 13, 1978, Appellant returned to her apartment, turned on both the radio and television news, and showed her a vial of valium, a gold ring, identified as Hunsicker's, and $20.00.[4] Jenkins stated that, to her knowledge, Appellant did not possess these three items on the previous day.

In late September or early October, 1979, Jenkins asked Appellant if he had killed Joyce Hunsicker. He initially denied his involvement, but later, in a second conversation, allegedly admitted to Jenkins that he had, in fact, slain Hunsicker.

Appellant raises a number of issues in his appeal to this Court, but only one need be addressed. Appellant correctly contends that this crime occurred prior to the effective

on September 13 without contradicting the testimony of Commonwealth witness, Sandra Jenkins, discussed below.

4. In spite of attempts by Appellant's trial counsel to get the Commonwealth's witness, Sandra Jenkins, to state that Appellant returned to her house late in the afternoon on September 13, Jenkins testified on direct examination that Appellant returned "around noon." (N.T., p. 3.97). She remembered that it was around noon "Because the news was on TV at 12:00." (N.T., p. 3.97). On cross-examination, witness Jenkins expressly refused to disavow this specific testimony (see N.T., pp. 4.110–4.111).

passage of the present Death Penalty Statute under which Appellant was sentenced, the Act of September 13, 1978, P.L. 756, No. 141, § 1, 42 Pa.C.S. § 9711.

We take judicial notice of information supplied to this Court by the Librarian of the Pennsylvania Senate to the effect that in July of 1978, Governor Milton Shapp vetoed the Death Penalty Statute and the House and Senate began considering an override. The Senate voted to override the veto on September 12, 1978, and adjourned for the day at 11:00 a.m. The House voted to override the veto on September 13, 1978, at around noon and adjourned for the day at 2:10 p.m. Since the terms of the statute make it effective immediately, the earliest that the statute became effective was when the House overrode the veto at around noon on September 13, 1978.

It is clear from the record in this case, accepting the evidence presented by the Commonwealth, and viewed in a light most favorable to the Commonwealth, that this homicide occurred prior to noon on September 13, 1978.

This Court has held on a number of occasions that the Legislature did not intend the Death Penalty Statute of September 13, 1978, to apply to an offense committed prior to its effective date. *Commonwealth v. Crenshaw*, 504 Pa. 33, 470 A.2d 451 (1983); *Commonwealth v. Truesdale*, 502 Pa. 94, 465 A.2d 606 (1983); *Commonwealth v. Story*, 497 Pa. 273, 440 A.2d 488 (1981).

For this reason, the judgment of sentence of death entered in this case is vacated and a sentence of life imprisonment imposed. This appeal is transferred to Superior Court for review and disposition of the other issues raised by Appellant.

ZAPPALA, J., did not participate in the consideration or decision of this case.

LARSEN, J., files a concurring opinion in which McDERMOTT, J., joins.

LARSEN, Justice, concurring.

Reluctantly, I must agree with the majority that the death penalty provisions and procedures of the Sentencing Code, Act No. 141, P.L. 756 of September 13, 1978, 42 Pa.C.S.A. § 9711 (the Act), cannot be applied in appellant's murder prosecution because the murder occurred prior to the effective date of the Act.

As I stated in my dissenting opinion in *Commonwealth v. Story,* 497 Pa. 273, 282–319, 440 A.2d 488 (1981) (joined by Flaherty and Kauffman, JJ.), I am of the belief that the legislature did intend the Act to be applicable to murders committed prior to the date of its enactment, and I perceive no constitutional or other impediment to such application. A majority of this Court ruled in *Story,* however, that the Act was not applicable to murders committed prior to its effective date, and this ruling remains the law in this Commonwealth. Accordingly, I have joined subsequent decisions holding that the Act is not applicable to murders committed before its effective date, for it would be a denial of equal protection to apply it to some and not to others who were similarly situated. *See, e.g., Commonwealth v. Truesdale,* 502 Pa. 94, 465 A.2d 606 (1983).

In the instant case, an amazing coincidence of timing took place. Right about the time that the appellant was murdering his victim, the General Assembly was in the process of overriding the Governor's veto of the death penalty act.

On September 12, 1978, the Senate voted to override the Governor's veto of July 1, 1978. Senate Legislative Journal, September 12, 1978 at 815–17. The following day, September 13th at "around noon," [1] the House of Representatives voted to override the veto. A bill becomes an act

1. While we do not have an exact time, the House convened at 10:00 a.m. on September 13, 1978 and conducted a good deal of business before it proceeded to discuss the Senate Bill 1233 veto override, and to call the vote. House Legislative Journal, September 13, 1978 at 2835–39. Following the vote, a lunch recess was taken, several committee reports were heard after the recess, and the House adjourned at 2:10 p.m. Thus the legislative journals support the librarian's information that the House override occurred "around noon."

of the General Assembly upon completion of the final constitutional requirement for enactment into law. *Simon v. Maryland Battery Service Co.*, 276 Pa. 473, 120 A. 469 (1923). Where the Governor has vetoed a bill, it will not become an act unless and until a two-thirds majority of each house votes to override the veto. Pa.Const. Art. IV, § 15. Thus, a bill passed notwithstanding the objections of the Governor becomes law when the *second* house (the final constitutional requirement) votes by two-thirds majority to override. Official Opinion of the Attorney General, No. 76–9, March 24, 1976. Therefore, the effective date of the Act was, as the majority states, at "around noon" on September 13, 1978. Prior to that, it was merely proposed legislation.

While we are not certain of the *exact* time of death, the trial court found that the Commonwealth's evidence established the time of death at *no later than* 12:00 noon on September 13, 1976. The Commonwealth points to certain testimony of the medical examiner during cross-examination that *could* support an inference that the murder occurred between 5:05 a.m. and 3:05 p.m. on September 13, 1978. Even were we to accept the Commonwealth's contention (which was contradicted by other evidence supporting the trial court's finding), the most favorable inference that such an inference would raise is, in the Commonwealth's own words, "that this crime *could have* occurred after the House vote." Supplemental brief at 8. "Could have" is simply not enough, for the Commonwealth had the burden of establishing that the murder was in fact committed when the Act was effective, not merely that it "might have been," or it "might not have been."

The Commonwealth has not proven that the murder occurred after the effective date of the Act; to the contrary, the record establishes that the murder occurred prior to 12:00 noon on September 13, 1978. Hence, under *Story*, appellant's judgment of sentence of death must be vacated, and a life sentence imposed.

McDERMOTT, J., joins in this concurring opinion.